[No. B212145. Second Dist., Div. Two. Oct. 19, 2009.]

BUS RIDERS UNION et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION
AGENCY, Defendant and Respondent.

## COUNSEL

Natural Resources Defense Council, David Pettit and Tim Grabiel for Plaintiffs and Appellants.

Jones Day, Elwood Lui, Brian D. Hershman, Brian M. Hoffstadt and Erica L. Reilley for Defendant and Respondent.

## OPINION

**BOREN, P. J.**—Appellants, Bus Riders Union, Labor/Community Strategy Center, and Natural Resources Defense Council (hereinafter collectively referred to as Bus Riders Union), appeal following the trial court's denial of their petition for a writ of mandate. Through its petition, Bus Riders Union challenged the use by respondent Los Angeles County Metropolitan Transportation Agency (MTA) of a statutory rate-setting exemption from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1]

This statutory exemption (§ 21080, subd. (b)(8)), in pertinent part, removes from CEQA review an agency's setting of "rates, tolls, fares, or other charges" which "the public agency finds" are for the purpose of "meeting operating expenses" (including employee wages and benefits), purchasing supplies and equipment, "meeting financial reserve needs," and "obtaining funds for capital projects necessary to maintain service within existing service areas." The statutory exemption also requires the agency to incorporate written findings in the record of any proceeding in which the exemption is claimed, and that the agency set forth "with specificity the basis for the claim of exemption." (§ 21080, subd. (b)(8).) MTA's use of this CEQA exemption in May of 2007 permitted, without an environmental impact report or compliance with other CEQA requirements, MTA's first fare increase in many years. This rate increase was authorized by MTA's board of directors, which also passed a resolution specifying why the fare increase was needed and how the additional revenue would be used.

Contrary to Bus Riders Union's contentions, we find, as did the trial court, that the administrative record contains substantial evidence that MTA's fare increase was enacted for one or more permissible purposes under section 21080, subdivision (b)(8), and that MTA's findings satisfy the specificity requirement in that provision.

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL SUMMARY

In May of 2007, MTA raised the base fare for bus and rail riders by 25 cents, instituted small increases for monthly passes, and approved similar fare increases for subsequent fiscal years. But for a cash fare increase from 1995 to 2003 followed by a fare reduction, the 2007 fare increase was the first increase in approximately 20 years.

Prior to adopting the fare increase, MTA held several fare forums and public hearings to allow various parties to be heard on the proposed fare increase. Bus Riders Union attended some of those hearings and objected to any fare increase, asserting an increase would disadvantage bus riders in favor of rail riders. MTA concluded, however, that a modest fare increase was warranted to address the budget deficit and to avoid reducing services. After extensive debate, the MTA board passed a resolution specifying why the fare increase was needed and how the additional revenue would be used.

MTA sought to fit within the statutory exemption that excepts public transit fare increases from CEQA compliance (despite any possible increase in pollution arising from people driving rather than using public transit). Thus, MTA declared that the proceeds from the fare increase would be used only for those purposes authorized by the exemption—i.e., for operational expenses and capital projects necessary to *maintain* service within existing service areas. MTA did not declare a rate increase to fund capital projects for the "expansion of a system" (Cal. Code Regs., tit. 14, § 15273, subd. (b)),[2] which is the opposite of the exemption and thus within the scope of the CEQA.

Specifically, in adopting the fare increase plan, on May 24, 2007, the MTA board passed a resolution which explained why this fare increase was needed and long overdue. The resolution was entitled, "RESOLUTION IN ACCORDANCE WITH CEQA FINDING THAT THE PURPOSE OF THE FARE RESTRUCTURING PLAN IS TO PAY OPERATING EXPENSES." The resolution cited the following factors: (1) that MTA's operating expenses exceeded its operating revenues by $641 million over the past five years; (2) that MTA's projected operating deficit over the next 10 years is $1.8 billion; (3) that MTA's average cost per boarding, on a systemwide basis was $2.39 but the base cash fare was $1.25, and the average MTA rider paid only

---

[2] Pursuant to section 21083, the state Office of Planning and Research has prepared and developed guidelines to assist public agencies in implementing CEQA. These guidelines are set forth in title 14, section 15000 et seq. of the California Code of Regulations. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

58 cents a boarding due to deep discounts for various passholders; (4) that fares now cover only 24 percent of the cost of an MTA ride, and 76 percent of the cost is subsidized by taxpayers (in comparison to 1988 when the taxpayers subsidized only 56 percent of each passenger's ride); (5) that MTA had reduced its reserves, slashed more than 500 administrative positions in the past five years, dramatically reduced its workers' compensation costs and aggressively pursued revenue raising measures (such as advertisements on bus and rail stations); (6) that MTA's funds typically programmed for future capital investments had already been used to augment MTA's bus operations budget for years, and if such resources are used to offset the deficit in fiscal year 2008, minimal fund balances would remain; (7) that MTA's massive operating deficit was siphoning funds that could be leveraged with state bond money or other state and federal dollars to fast-track critical relief on the region's congested highways and transit system; and (8) that MTA will not be able to meet its operating expenses as soon as fiscal year 2009 or add any new transit services if action is not immediately taken to offset or eliminate the operational deficit.

The resolution concluded by declaring—in language largely parroting section 21080, subdivision (b)(8)—that the fare increase "will be used" only for the purposes of "meeting operating expenses, including employee wage rates and fringe benefits, purchasing or leasing supplies, equipment or materials, meeting financial reserve needs and requirements, and obtaining funds for capital projects, necessary to maintain service within existing service areas."

The administrative record reveals, in pertinent part, that since 1989, MTA's fuel costs rose nearly 140 percent, employee benefit costs increased dramatically, and the Consumer Price Index rose nearly 70 percent. During that same time, MTA had raised its base fare by 15 cents (or 14 percent). For many years MTA managed to keep fares "artificially low" by "tapping contingency funds." For example, MTA diverted funds that would otherwise have been used to fund capital projects for expansion of its bus and rail systems, cut administrative costs, reduced certain employee levels, deferred capital maintenance projects to maintain existing levels of service, and dipped into reserve balances and one-time revenues. Nonetheless, MTA ran an increasing deficit in its bus and rail operations that was estimated to approach $1.8 billion by fiscal year 2018.

Significantly, MTA's "fare recovery ratio"—i.e., the percentage of operating costs covered by fare revenues—fell from 44 percent in 1989 to only 24 percent in 2006, resulting in taxpayers subsidizing the remaining 76 percent. Thus, even after accounting for all revenue from the modest fare increase approved, the "fare recovery ratio" would increase only slightly and operating costs would still have to be subsidized from other sources.

In September of 2008, the trial court denied Bus Riders Union's petition for writ of mandate and entered judgment rejecting the CEQA challenges to the fare increase. The court found that MTA's fare increase was exempted from CEQA by operation of section 21080, subdivision (b)(8), and California Code of Regulations, title 14, section 15273, subdivision (b), in light of its conclusion that "[t]here is substantial evidence that [MTA] uses all of its fare revenue solely to pay operating expenses." In support of its conclusion, the court cited MTA's recent funding matrix (showing revenue sources, allocations, grants, financing proceeds, etc.), which indicated that all of MTA's system-expanding capital projects were funded from sources other than fare revenue, and that fare box revenue was used to cover operating expenses. The court additionally cited several funding documents for MTA's three existing system-expanding capital projects, which indicated that "funding of future expansion has been secured from other sources."

The court concluded that Bus Riders Union had failed to show that the fare increase would be used to fund capital projects for the expansion of a system, and found that MTA's use of the statutory exemption was appropriate and in compliance with CEQA.

Bus Riders Union appeals the judgment denying its petition for a writ of mandate.

## DISCUSSION

I.  *The standard of review.*

"Judicial review of a CEQA challenge to an agency's quasi-legislative action where no administrative hearing was required is governed by section 21168.5, which limits judicial inquiry to whether there was a prejudicial abuse of discretion. [Citations.] 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.] 'Generally speaking, an agency's failure to comply with the procedural requirements of CEQA is prejudicial when the violation thwarts the act's goals by precluding informed decisionmaking and public participation. [Citations.]' " (*Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 967 [88 Cal.Rptr.3d 506], fn. omitted (*Great Oaks*).) While this standard of judicial review applies to case-specific issues of compliance with the law and sufficiency of the evidence, " 'questions of interpretation or application of the requirements of CEQA are matters of law' " subject to de novo review. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1375 [44 Cal.Rptr.3d 128] (*San Lorenzo*).) Such de novo review includes analysis of

the scope of a CEQA exemption, which is an issue of statutory interpretation. (*San Lorenzo*, at p. 1375.) Nonetheless, the substantial evidence test governs our review of an agency's factual determination that a project falls within a statutory or categorical CEQA exemption. (*San Lorenzo*, at p. 1382.)

A court may overturn an agency's actions under CEQA if the agency's decision is not supported by "substantial evidence." (§ 21168.5; see *San Lorenzo, supra*, 139 Cal.App.4th at p. 1382.) "Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 [133 Cal.Rptr.2d 718].)

The agency bears the burden of showing that substantial evidence supports its finding that a particular CEQA exemption applies. (*Great Oaks, supra*, 170 Cal.App.4th at p. 968.) However, this is a deferential standard that is satisfied if "the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached." (*Ibid.*) In assessing whether substantial evidence exists to support a finding that a particular CEQA exemption applies, "all conflicts in the evidence are resolved in [the agency's] favor and all legitimate and reasonable inferences are indulged in to uphold findings, if possible." (*Great Oaks*, at p. 968; see *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 564, 570–571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) In a similar vein, section 21080, subdivision (e)(1), explains that "[f]or the purposes of this section and this division, substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."

Finally, "[w]e review the agency's action and not the trial court's decision." (*Great Oaks, supra*, 170 Cal.App.4th at p. 968.)

II. *Substantial evidence supports the conclusion that MTA's proposed fare increase qualified for the CEQA exemption under section 21080, subdivision (b)(8).*

The Legislature has created a myriad of exemptions from CEQA, and such exemptions exist regardless of resulting conflicts with CEQA's environmental purposes. "As a practical matter, the statutory exemptions have in common only this: the *Legislature* determined that each promoted an interest important enough to justify forgoing the benefits of environmental review." (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 382 [267 Cal.Rptr. 569, 787 P.2d 976].)

Here, as the trial court properly found, there is substantial evidence in the administrative record to support MTA's finding that its May 2007 fare

increase was for one or more of the permissible purposes listed in the applicable CEQA exemption, section 21080, subdivision (b)(8). Specifically, the fare increase was to meet operating expenses and to maintain service within existing service areas.

MTA's resolution explicitly and clearly declared its intent to use the fare increase revenue solely for purposes permissible under section 21080, subdivision (b)(8). MTA's proclamation alone is sufficient to satisfy the substantial evidence test. It is well established that courts "may not speculate on the future intention of a public agency" (*Viso v. State of California* (1979) 92 Cal.App.3d 15, 24 [154 Cal.Rptr. 580]), and "[a]ll presumptions of law are in favor of the good faith of public officials . . ." (*Crowe v. Boyle* (1920) 184 Cal. 117, 156 [193 P. 111]; see Evid. Code, § 664). Thus, MTA is presumed to act in good faith, and Bus Riders Union may not challenge MTA's declaration of future intent.

*City of Santa Barbara v. Davis* (1904) 142 Cal. 669 [76 P. 495], is instructive. There, our Supreme Court refused to entertain a challenge to a city ordinance approving a land purchase on the ground that the city might not follow its declared intent to use the land for a firehouse. (*Id.* at p. 672.) The court found the city's action "not open to review . . . on any such ground as that the city council did not in fact intend to carry out the purpose of the purchase as clearly indicated by the ordinance itself." (*Ibid.*) Similarly, Bus Riders Union may not challenge MTA's declared intention as unambiguously set forth in its May 2007 resolution.

Bus Riders Union also seeks to challenge MTA's declaration of intent by citing to selective portions of public statements made by MTA indicating that the fare increase will enable MTA to resume its growth projects. However, a proper reading of these statements does not reveal any indication that MTA has used or will use fare box revenue for system-expanding capital projects. Rather, these statements merely confirm that for many years MTA diverted revenue to cover its operational deficit, and that the additional revenue from the proposed fare increase would allow MTA to divert less money because the deficit will decrease. Thus, none of the statements in question undermine MTA's declaration in its resolution: that revenue from the fare increase will be used directly to cover operating expenses and system-maintaining projects.

■ Nor is there any merit to the implicit argument of Bus Riders Union that MTA should be disqualified from relying on the statutory CEQA exemption because MTA will use the fare box revenue to pay operating expenses, which will consequently allow MTA to stop diverting funds to cover those expenses and permit it to use newly freed-up money for system-expanding capital projects. This rather attenuated notion is unavailing.

The Legislature simply imposed no derivative limitation on the use of an agency's funds freed up by virtue of a fare increase otherwise permitted under the CEQA exemption. The statutory language of the CEQA exemption is clear and cannot be judicially expanded. (See *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

Even assuming Bus Riders Union could undermine MTA's declaration of its future intent, the factual record supports MTA's stated intentions. As the trial court aptly concluded, there is "substantial evidence" that MTA "uses all of its fare revenue solely to pay operating expenses." The record establishes that since 1989, increases in the cost of providing service to MTA customers have far outpaced increases in fares. During this time period, the consumer price index increased approximately 70 percent, employee benefit costs increased dramatically, and the cost of fuel increased more than 140 percent. During this same time period, MTA's base fare increased only 14 percent. Consequently, MTA's "fare recovery ratio" dropped dramatically from 44 percent in 1989 to only 24 percent in 2006.

Thus, the "fare recovery ratio" alone provides substantial evidence that the revenue from the fare increase will be applied solely to operating expenses. Indeed, MTA is statutorily required, "[i]nsofar as practicable," to apply revenue toward operating expenses first. (Pub. Util. Code, § 30638, subd. (a).)

Also, the evidence in the record—aptly noted by the trial court in its judgment—confirms that MTA has adhered to and will continue to adhere to legal requirements in its use of fare revenue. For example, MTA's proposed budget for fiscal year 2008 reveals how passenger fare revenue is spent, and establishes that fare revenues are devoted entirely to expenses that are either operating expenses or capital expenses pertaining to the existing system (bus maintenance, etc.). None of these expenses are system-expanding capital projects.

On the other hand, the proposed budget for fiscal year 2008 listed system-expanding capital projects (i.e., the Expo Line, the Gold Line extension, and the light-rail vehicle fleet related to those two projects) as all funded from sources *other than fare revenue.* Funding sources for those expansion projects included, for example, bond revenue related to two ballot propositions, revenue from local sales tax, and grants from federal, state, and city governments. As the trial court observed, funding for future expansion was secured from sources other than passenger fare revenue.

Bus Riders Union notes that MTA's budget reflects several other capital projects. However, those other capital projects are not determinative of the

CEQA exemption because they are not projects that *expand* the transit system. Rather, they are projects that are for bus or rail maintenance, facilities improvement, or system upgrades. Thus, although Bus Riders Union asserts that certain structural deficits impermissibly include future capital programs, the future capital programs included in the structural deficit are *system-maintaining* programs (such as for new buses and overhauling buses), which are permitted under the CEQA exemption in question.

Nor is there any merit to Bus Riders Union's complaint that MTA's budget spreadsheets in the administrative record were purportedly "cryptic" and not accompanied by any explanatory testimony. Those documents likely were created to conform to generally accepted accounting principles. MTA's budget documents simply were not created to facilitate CEQA litigation. Although it may have been a challenge to interpret those budget documents (and Bus Riders Union apparently misreads some of the financial records), MTA's budget documents were responsive to the issue litigated and properly in the administrative record.

Accordingly, the administrative record contains abundant substantial evidence that MTA enacted its May 2007 fare increase for purposes within the ambit of the CEQA exemption set forth in section 21080, subdivision (b)(8).

III. *MTA's findings satisfy the specificity requirement of section 21080, subdivision (b)(8).*

Section 21080, subdivision (b)(8) requires that "[t]he public agency shall incorporate written findings in the record of any proceeding in which an exemption under this paragraph is claimed setting forth with specificity the basis for the claim of exemption." In the present case, concurrently with its approval of the fare increase, MTA adopted a resolution with findings that summarized facts contained elsewhere in the administrative record and, in particular, set forth the following factors in support of its claim of the CEQA exemption: MTA's projected $1.8 billion structural deficit; its uncommonly low 24 percent fare recovery ratio; its prior efforts to defray the deficit, including siphoning funds originally destined for system-expanding capital projects; and its need for immediate action to offset the deficit. MTA's resolution concluded, in language parroting the statute, that "any fare structure adopted on this date will be used for the purpose of meeting operating expenses, . . . purchasing or leasing supplies, equipment or materials, meeting financial reserve needs and requirements, and obtaining funds for capital projects, necessary to maintain service within existing service areas."

Contrary to the assertion of Bus Riders Union, the above findings by MTA are sufficient to comply with the requirement that it set forth "with specificity

the basis for the claim of exemption." (§ 21080, subd. (b)(8).) MTA's resolution contained more than merely a cut-and-paste statement parroting the language of the statute. MTA's resolution also contained the above noted findings, which specifically explained the basis for its claimed exemption.

"There is nothing in the statute that requires an agency to do more than set forth the specific basis for the ultimate finding—that the rate increases were for one or more specifically identified exempt purposes. The statute, by its terms, does not require the agency to set forth 'with specificity' its evidentiary subconclusions supporting this ultimate fact or its rationale, instead only 'the basis for the claim of exemption.' " (*Great Oaks, supra,* 170 Cal.App.4th at p. 972.) Thus, for example, MTA's resolution cannot be faulted for not including information about the number of fare increases and the anticipated total revenue from the increases, because that type of information is not the *basis* for the claim of exemption. Nor could the agency be required to cite to the administrative record which, of course, is not created until after the agency's action and after any litigation has ensued.

In *Great Oaks,* the water district's board adopted a resolution increasing groundwater rates that (1) referred to portions of the annual report in its findings, and (2) also stated that the rate increases were " 'for the purpose of meeting operating expenses, purchasing or leasing supplies, equipment or materials, and meeting financial reserve needs; and obtaining funds for capital projects necessary to maintain service within existing service areas.' " (*Great Oaks, supra,* 170 Cal.App.4th at pp. 973–974.) The Court of Appeal held that the resolution met the specificity requirement of section 21080, subdivision (b)(8), finding that "although the District's findings could have been more detailed or could have made more specific reference to facts in the record" (170 Cal.App.4th at p. 972), the board "minimally satisfied this requirement by its identification of the statutory purposes for which it claimed its action to be exempt—the ultimate factual bases for the claim of exemption—coupled with the District board resolution's references in related findings to portions of the annual report and other information and evidence provided during the hearing process" (*ibid.*).

Bus Riders Union urges that *Great Oaks* was wrongly decided because it looked to the law of administrative mandamus, where detailed findings are required, to give context to the specificity requirement of section 21080, subdivision (b)(8), and CEQA actions are premised on traditional mandamus, where findings are not typically required. (170 Cal.App.4th at pp. 969–973.) However, the claim by Bus Riders Union that the specificity requirement in section 21080, subdivision (b)(8) is purportedly "more stringent" than the specificity rule for administrative mandamus is a notion unsupported by any case law or logic.

Accordingly, we adhere to the reasoning in *Great Oaks*, and conclude that MTA's findings satisfied the specificity requirement of section 21080, subdivision (b)(8).

## DISPOSITION

The judgment is affirmed.

Ashmann-Gerst, J., and Chavez, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 21, 2010, S178306.